UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
NATHANIEL WATT,

                       Plaintiff,            Dkt No: 22-cv-6841(AMD)(JAM)

   -against-

THE CITY OF NEW YORK, et al.,

                                                  **DECLARATION OF**
                                                  **DEFENDANT KEVIN**
                                                  **BLACKETT**

                      Defendants.
------------------------------------------------------------- x

       **KEVIN BLACKETT**, declares pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and accurate:

## PRELIMINARY STATEMENT

      1.     I am the owner of a two-family home, located at 9101 Avenue N, Brooklyn, New York, Kings County. My property is located in the Canarsie neighborhood. I purchased this home with my father in 2006. After my father passed away in 2012, I became the sole owner of the home.

      2.     It was on November 19, 2019, at approximately 6:30 P.M., while I was in the basement of my home when Plaintiff Nathaniel Watt entered into the basement apartment of my home without any permission or authority to do so.

      3.     This Declaration is submitted by me as the Plaintiff waived his right to have me sit for a deposition in this matter. Therefore, I make this Declaration to support my Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

**Details of Events at 9101 Avenue N**

4. On November 19, 2019, at approximately 6:30 P.M., I arrived at 9101 Avenue N, Brooklyn, New York Kings County ("9101 Avenue N"). I was with my then fiancé, now my wife, Shanee Roberts-Blackett. We were primarily going to 9101 Avenue N to retrieve some of our property stored in the basement of the house. I was previously made aware that the adult son of the tenant in the second floor apartment was illegally hanging out with his friends in the basement apartment.

5. 9101 Avenue N was a home my father and I purchased in 2010. There are two apartments I rent out. The one on the first floor when you enter the front door. The second-floor apartment is located up two short flights of stairs. The basement apartment was not rented to anyone and was completely off-limits to all tenants. I have used the area for storage since I moved out of the home in 2016.

6. Both tenants are month-to-month tenants. Ms. Carlotta Andries is the upstairs tenant, she has been at 9101 Avenue N since 2011. She had a year-to-year lease until 2016, and has been a month-to-month tenant since 2016. She has two children, her son is a friend of the Plaintiff, his name is Shaquille Erskine ("Erskine"). The first-floor tenant has lived there since 2016. She also had a one-year lease, and has been month-to-month since 2017. The first-floor tenant has no involvement in this case.

7. I, along with my fiancé, now my wife, Shanee Roberts-Blackett, entered 9101 Avenue N by the front door, at approximately 6:15PM. We walked down three steps and entered the locked basement apartment door. There is a small area immediately in front of the basement apartment door, it is in that space I had the heat/gas boiler for the house. There was no light on in this area at this time.

8.  Both Shanee and I entered the basement apartment and I shut and locked the door behind us. The air in the room smelled and I could clearly smell the residue of marijuana smoke. Shanee went to the back of the room and turned on a light and opened a window. I stayed in the room nearest the apartment door where I put a light on and opened a window. I observed that our personal property, we had stored in the basement was disturbed and was in disarray. I could also see in the area near the bathroom had human feces and the toilet had a bacteria growing inside it.

9.  I was in the basement apartment for approximately 10-15 minutes, when I heard someone at the door of the apartment trying to enter. There was no light in the small area outside the apartment door. There was no knock, or any verbal communication, before someone started to attempt to open the door.

10. I am a New York City Department of Corrections ("DOC"), Correction Officer ("CO"). I have been a CO since 2011. I had a Personal Protection Firearm ("PPF"), a 9mm Glock 19. I have a permit to "carry" this pistol when off-duty. I un-holstered my PPF and went towards the locked door of the apartment, which was now being pushed open. I extended my arms holding the PPF with both hands as the door opened, I yelled I was an officer. I could see a male dressed in all black, who was a little taller than me, approximately 6 foot 2 inches tall. I later learned this male's name to be Nathaniel Watt, the Plaintiff in this case.

11. While I had my arms extended and my two hands on the pistol, the Plaintiff then grabbed the pistol. He was attempting to disarm me, he grabbed my right hand and wrist, we began to struggle for the 9mm pistol. While we were struggling over the pistol, it discharged one shot. Plaintiff went to the floor, I thought he was shot, but he immediately began to yell at me and to move. At that time, I told him to get up. I had my handcuffs with me and was about to handcuff him for my safety and for Shanee's safety and protection. At the same time, the second

floor tenant's son, Mr. Erskine came downstairs. He was also yelling, I think he was yelling, "What happened! What happened!" I called out to Shanee to call 911, she was still behind me. I told Mr. Erskine to go back upstairs to the front door stairway landing. I then grabbed Plaintiff Watt by the back of his jacket and walked him upstairs. I wanted to get back upstairs where there was a light on. Plaintiff Watt continued to yell he was shot.

12. I heard Shanee giving the 911 operator information. I hear her tell the 911 operator that I was a member of service – she provided a full description of my clothing and my physical appearance; she also gave a description of Plaintiff Watt and his clothing. At no time did she say I should shoot Plaintiff Watt.

13. I got up to the staircase landing area and told both Mr. Erskine and Plaintiff Watt to sit on the staircase. I still had my PPF in my hands. I kept the pistol out as I was with two adult males standing in front of me and Plaintiff Watt had just assaulted me. He tried to take my pistol from me, and broke into my home.

14. Both Shanee and I stepped out of the hallway area and stood outside the front door to await the NYPD response. I could hear police car sirens were on their way. Mr. Erskine and Plaintiff Watt remained on the staircase. I had my PPF still in my hand. I was not pointing it at either Plaintiff or Mr. Erskine.

15. The NYPD arrived at approximately 6:36 P.M. Two officers and then two more officers entered the front yard yelling at me numerous times to drop my weapon. I immediately complied and placed it on the ground and raised my hands above my head. One of the officers handcuffed one of my hands, but upon me producing my identification, the handcuff was removed.

16. Both Mr. Erskine and Plaintiff Watt began to yell at the responding police officers. Mr. Erskine was saying this was a miscommunication and Plaintiff Watt saying I shot him in the eye.

17. One of the responding police officers took possession of my PPF. I began to tell the officers what had just happened. I told them I was in the basement, which is in my house, someone tried to come in through the door, I displayed my pistol, Plaintiff Watt grabbed it and tried to take it away from me, we struggled for possession of the pistol, and it discharged. At that point, the responding police officer contacted his supervisor. The responding police officers told me, and I heard them tell Mr. Erskine and Plaintiff Watt that they were recording what was happening and being said on their Body Worn Cameras ("BWC").

18. One of the police officers told me to call my union delegate and to have the delegate meet me at the 69th Precinct. The police officer explained to me I was going to be interviewed by members of the NYPD Internal Affairs Division ("IAD") unit and most likely someone from DOC. As I was never involved in an off-duty incident , this information was helpful.

19. I stayed at the scene for about an hour after the incident. While at the scene, I stayed away from the front door and hallway where both Mr. Erskine and Plaintiff Watt were interacting with the other NYPD officers who came to the scene. I did hear Plaintiff Watt say to the NYPD Officers "You know me!" a number of times. I observed the NYPD supervisor arrived at the scene and a short time later. While at the scene I was escorted back down to the basement apartment where I gave a statement to the NYPD Supervisor Lieutenant Hussain. There were a number of police officers also there and their BWC were operational when I made a brief statement to Lt. Hussain, and explained what had happened. While I was explaining the events

leading to the discharge of my PPE I believe the uniformed NYPD officers located both the bullet that was discharged and the shell casing.

20.     I was escorted back upstairs and continue to wait by the side of my house. I remained at the side of the house until the NYPD Evidence Collection Unit ("ECU") arrived. When ECU arrived I again went to the basement with them, and identified where the pistol accidentally discharged. I went back upstairs and observed both Plaintiff Watt and Mr. Erskin being handcuffed and placed in separate police cars. I was then instructed to drive to the 69th Precinct.

21.     At the 69th Precinct I was placed in an office, where my union delegate met me. I was interviewed by NYPD IAD, additionally a DOC Investigator took possession of my pistol from a NYPD Officer. Eventually, one officer took my statement concerning my ownership of 9101 Avenue N. I believe this officer was the Arresting Officer for Plaintiff Watt. I was interviewed by this police officer as a crime victim.

22.     I had no role in making any decision whether Plaintiff Watt should be arrested.

23.     I had no role in determining what charges under the New York State Penal Law Plaintiff Watt would be arrested for. After leaving my home I never saw Plaintiff Watt again.

24.     I did not fill out or file any other paper work associated with Plaintiff Watt's arrest.

25.     I never handcuffed or placed Plaintiff Watt under arrest or placed him in any custodial confinement. When he was on the stairway I was ensuring he did not attempt to leave before the responding Police Officers arrived at 9101 Avenue N. I also held him and Mr. Erskin in the stairway for my own protection. What if any criminal charges would be lodged against

Plaintiff Watt was not my determination. I fully cooperated with all inquiries with the NYPD and by employer DOC.

26.  I signed a corroborating affidavit that stated I did not give Plaintiff Watt permission or authority to be at or in my home 9101 Avenue N on November 19, 2019.

27.  I never went to Court concerning the criminal court complaint that the Kings County District Attorney ("KCDA") filed against Plaintiff Watt.

28.  Moreover, I was never consulted, in March 2020, by any member of the KCDA's office before they offered Plaintiff Watt an Adjournment in Contemplation of Dismissal ("ACD") to close out the three (3) Trespass charges that were in the Criminal Court complaint.

29.  I was a crime victim and was not treated fairly at the KCDA's office. Plaintiff Watt did violate the Penal Law. Watt's conduct that evening was reckless, assaultive, negligent, and intentional. Watt was also a trespasser on my property that evening. He assaulted me, he attempted to take my 9mm pistol out of my hand, which constitutes an attempted robbery. His actions constituted an assault upon me. His assault upon me caused my 9mm pistol to accidentally discharge. But for the grace of God – both of our lives could have seriously changed in a dramatic way in that small unlit hallway. The bullet missed his head, but went through the hoodie he was wearing and his coat. He was so close to the pistol that he had gun powder residue in his eye. Thankfully not a bullet. I am civilly Counter-suing him in this action for common law, assault and battery, and trespass.

30. I was never disciplined by DOC for the events surrounding November 19, 2019. My PPF was held by DOC until 2023 when the DOC investigation was closed, and I was found to have acted in accordance with the Rules and Regulations of the DOC.

Dated: New York, New York
       June 5, 2025

                                            KEVIN BLACKETT