UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

**NATHANIEL WATT**,

              Plaintiff,

        – against –

**THE CITY OF NEW YORK**, **NEW YORK CITY POLICE OFFICERS PATRICK GOURLAY** and **JOHN REDHEAD**, **OFFICERS JOHN DOE** and **JANE DOE #1–15**, **NEW YORK CITY DEPARTMENT OF CORRECTIONS COMMISSIONER LOUIS MOLINA**, and **OFFICER KEVIN BLACKETT**,

              Defendants.

------------------------------------------------------------------ X

**MEMORANDUM DECISION AND ORDER**

22-CV-6841 (AMD) (JAM)

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings this 42 U.S.C. § 1983 action against New York City Police Officers Patrick Gourlay and John Redhead (the "Officer Defendants") and New York City Department of Corrections ("DOC") Officer Kevin Blackett, asserting claims arising under federal and state law, including false arrest, excessive force, malicious prosecution, denial of a fair trial, conspiracy, assault, battery, and deliberate indifference to medical needs.  (ECF No. 62.)

Before the Court is the Officer Defendants' motion for summary judgment and motion to dismiss (ECF No. 83),[1] and defendant Blackett's motion for summary judgment (ECF No. 77).

---

[1] The Officer Defendants styled their motion as a motion to dismiss and a motion for summary judgment; the plaintiff amended the complaint after the close of discovery, and the Officer Defendants have not answered the amended complaint.  However, the parties "compiled a substantial factual record through a lengthy period of discovery," and the plaintiff "did not confine his arguments to the allegations in the complaint."  *Miller v. Lamanna*, No. 24-CV-2314, 2026 WL 643744, at *8, 10 (2d Cir. Mar. 9, 2026).  Therefore, in an abundance of caution, the Court reviews the Officer Defendants' motion by summary judgment standards under Rule 56.  *See id.*

As explained below, the Court grants the Officer Defendants' motion, and grants Blackett's motion for summary judgment on the conspiracy claim, but denies his motion on the other claims.

**BACKGROUND**[2, 3]

### I.    Factual Background

Blackett, a New York City Department of Corrections officer, owned the building located at 9101 Avenue N in Brooklyn.  (Blackett 56.1 ¶ 12; Officer Defs. 56.1 ¶ 6.)  Blackett rented the second-floor apartment to Shaquille Erskine's family; he also rented a separate apartment on the first floor to another tenant.  (Blackett 56.1 ¶ 3.)[4]  Blackett did not rent out the basement unit, which he used for storage, and was off-limits to his tenants.  (*Id.* ¶ 2.)  The plaintiff thought that the Erskine family owned the entire building and were using the basement.  (*Id.*)

---

[2] Blackett submitted body-worn camera footage for four NYPD officers, (ECF No. 78), and the plaintiff submitted footage for seven officers (ECF No. 85).  For ease of reference, the Court cites ECF No. 78 when discussing the videos and indicates which officer's body-worn camera footage it is referring to.

[3] The factual background is based on the Court's review of the record, including the parties' briefs, Rule 56.1 statements of fact and counterstatements, and all supporting exhibits, including body-worn camera footage from the night of the plaintiff's arrest.  (*See* ECF No. 58-1 (Blackett's Rule 56.1 statement with the plaintiff's responses ("Blackett 56.1")); ECF No. 60-1 (the Officer Defendants' Rule 56.1 statement with the plaintiff's responses ("Officer Defs. 56.1")); ECF No. 78, Exhibit B, ("Officer Morris Body-Worn Camera Footage"); ECF No. 78, Exhibit I ("Lieutenant Hussein Body-Worn Camera Footage"); ECF No. 78, Exhibit K ("Officer Yardan Body-Worn Camera Footage").)  All citations incorporate the responses and objections of the opposing party.  Although Blackett filed a 56.1 statement, which included the plaintiff's responses, in connection with the pre-motion conference, he did not file one with his motion for summary judgment.  The Officer Defendants filed a 56.1 statement with their pre-motion conference letter, which includes the plaintiff's responses, and filed another 56.1 statement with their motion (*see* ECF No. 80), to which the plaintiff did not respond; he asks the Court to "disregard" the second 56.1 statement, claiming that the Officer Defendants submitted it "without prior notice and opportunity for Plaintiff to respond, in violation of the Rules and Standards of the Court," (ECF No. 88 at 6 n.1).  The Court relies on the 56.1 statements that the parties submitted before the November 2024 pre-motion conference.

[4] The plaintiff states that he has not received the exhibit Blackett relies on for support in paragraphs 1, 3–5, 7, and 10 of his 56.1, and "can neither confirm nor dispute these facts at this time."  (Blackett 56.1 ¶¶ 1, 3–5, 7, 10.)

2

On November 19, 2019, the plaintiff went to the building because Shaquille Erskine asked him for help cleaning the basement. (Officer Defs. 56.1 ¶¶ 1, 4.) At about 6:15 p.m., Blackett and his fiancée came to the building to get some things from the basement. (Blackett 56.1 ¶ 4.)[5] Blackett was carrying his "personal protective firearm," for which he had an off-duty carry permit. (*Id.* ¶ 12.) Blackett and his fiancée went into the basement, locking the door behind them. (*Id.* ¶ 7.) Blackett saw that his things had been disturbed, and that there was feces near the bathroom, and "bacteria" growing in the toilet. (*Id.*)

Blackett and the plaintiff disagree about what happened next. Blackett says that he "heard someone outside of the door of the basement apartment trying to enter without any knock or verbal communication." (*Id.* ¶ 11.) As the door was "being pushed open," Blackett, "in fear of his safety and [his fiancée]'s, unholstered his [gun] and went towards the locked door." (*Id.* ¶ 13.) Blackett "extended his arms holding his [gun] with both hands as the door opened, yelling that he was an [o]fficer." (*Id.*) The door opened, and he saw the plaintiff, "dressed in all black, a little taller than himself." (*Id.*) The plaintiff grabbed Blackett's gun and tried to disarm him by grabbing Blackett's right hand and wrist. (*Id.* ¶ 14.) Blackett's gun then "accidentally discharged one shot in the direction of Plaintiff." (*Id.*)

The plaintiff disputes Blackett's account. He says that the basement light was on, and that he knocked on the door more than once. (*Id.* ¶¶ 11, 13.) Blackett "opened the door and shot at plaintiff." (*Id.* ¶ 13.) The plaintiff "did not grab the gun or attempt to disarm Blackett or engage in a struggle." (*Id.* ¶ 14.)

---

[5] Blackett's fiancée is also a Corrections Officer. (Officer Morris Body-Worn Camera Footage at 00:50-00:58.)

The parties agree that the plaintiff fell, and that Erskine started yelling and came downstairs. (*Id.* ¶ 15.) Blackett grabbed the plaintiff by his jacket and took him upstairs. (*Id.* ¶ 16.) At some point, Blackett's fiancée called 911. (*Id.* ¶¶ 15–17.)[6] Blackett told the plaintiff and Erskine to sit on the stairs, which were immediately inside the front door. (*Id.* ¶ 18.) At this point, Blackett was still holding his gun. (*Id.*)[7] Blackett and his fiancée waited for the police outside, while the plaintiff and Erskine sat on the stairs. (*Id.* ¶ 19.) Blackett was still holding his gun, but was not pointing it at the plaintiff and Erskine when the police arrived at about 6:36 p.m. (*Id.* ¶¶ 19, 20.) Officers yelled at Blackett to put down his gun, and Blackett complied. (*Id.* ¶ 20.) An officer handcuffed Blackett, but removed the cuffs after Blackett showed them his DOC identification. (*Id.*)

Blackett told the officers that he owned the building, that there was "smoking going on" in the locked basement, and that he was the only one authorized to use it. (Officer Morris Body-Worn Camera Footage at 00:58–1:22.) He explained that Erskine's mother was the second-floor tenant, and that Erskine and his friends regularly broke into the basement to smoke marijuana. (*Id.* at 1:22–1:46.) Blackett told the officers that "two minutes" after he went into the basement, the plaintiff came to door and reached for Blackett's hand, and that Blackett's gun "discharged." (*Id.* at 1:46–2:06.) At that point, one of the officers advised Blackett that they were wearing body-worn cameras and that Blackett should contact his union delegate. (*Id.* at 2:06–3:05.)

The plaintiff, who was still sitting on the stairs, asked the police if he could explain "what really happened." (*Id.* at 3:05–3:12.) He said that Blackett was lying. (*Id.* at 3:12–3:22.)

---

[6] The parties disagree about when Blackett's fiancée called 911. Blackett claims it was when they were still downstairs, (Blackett 56.1 ¶ 15), while the plaintiff says she called after they went upstairs, (*Id.* ¶ 16).

[7] The plaintiff claims that Erskine's sister also ran downstairs, and that Blackett held all of them at gunpoint before they got upstairs. (*Id.*)

4

According to the plaintiff, the basement door was locked when he came over to help his friend. (*Id.* at 3:12–3:22.)  He knocked on the door, Blackett opened the door, and then shot him in the face. (*Id.* at 3:12–4:22.)[8]  The officers asked the plaintiff twice if he needed an ambulance or wanted to go to the hospital. (*Id.* at 4:22–4:56.)  The plaintiff did not respond, but continued to tell the police his side of the story; about five minutes later, one of the officers said to the plaintiff, "I know I asked before and you didn't answer me — do you want an ambulance?" (*Id.* at 4:22–10:02.)  That officer and another officer followed up multiple times in an effort to see whether the plaintiff wanted medical attention. (*Id.* at 10:02–10:16.)

Officers separated Blackett from Erskine and the plaintiff, and Erskine explained that he let the plaintiff inside while he went upstairs to put on sneakers. (*Id.* at 6:26–6:40.)  Erskine admitted that he used to "sneak down" to the basement, which his family did not rent. (*Id.* at 6:40–6:46.)  When his mother told him to stop going downstairs, he asked the plaintiff to help him clean it up. (*Id.* at 6:46–6:58.)

Lieutenant Hussein arrived at the building at about 6:46 p.m. (Blackett 56.1 ¶ 25.)  He instructed Officer Gourlay to "secure the scene," and directed another officer to bring Blackett downstairs. (*Id.* ¶ 25; Lieutenant Hussein Body-Worn Camera Footage at 4:35–5:15.)  After Blackett gave his version of the events, he went back upstairs and waited outside until officers from the Evidence Collection Unit ("ECU") arrived. (Blackett 56.1 ¶ 32.)  Blackett showed them where the shooting took place. (*Id.*)[9]  Next, officers told him to drive to the 69th Precinct, where his union delegate met him. (*Id.* ¶¶ 32, 35.)  An investigator from the Internal Affairs Bureau interviewed Blackett. (*Id.* ¶ 35.)  A Department of Corrections investigator took

---

[8] The plaintiff repeated this a few times.

[9] ECU officers recovered a bullet and a shell casing from the basement. (Blackett 56.1 ¶¶ 29–32.)

Blackett's gun. (*Id.*)[10] At some point, an NYPD officer interviewed Blackett. (*Id.*) Blackett also signed an affidavit in which he said that he did not give the plaintiff permission or authority to be at or in 9101 Avenue N on November 19, 2019. (*Id.* ¶ 40.)

At one point, the plaintiff asked if he could wash out his eye. (*Id.* ¶ 33; Officer Yardan Body-Worn Camera Footage at 1:15–1:30.) Officer Yardan asked Erskine's mother for water, which she brought. (Blackett 56.1 ¶ 33; Officer Yardan Body-Worn Camera Footage at 1:30–1:35, 2:50–3:12.)[11] The plaintiff washed out his eye. (Officer Yardan Body-Worn Camera Footage at 4:00–4:45.)

Police officers arrested the plaintiff and took him to the 69th Precinct. (Officer Defs. 56.1 ¶¶ 12, 14.) Once there, he asked for medical assistance. (*Id.* ¶ 14.) About 30 minutes later, he went by ambulance to the hospital, where a doctor treated him for corneal abrasions. (*Id.* ¶¶ 15–16.) The police took him back to the 69th Precinct, where Officer Redhead advised him of his constitutional rights. (*Id.* ¶ 17.) The plaintiff waived his rights, and told Officer Redhead that he went to 9101 Avenue N to clean the basement, and that "he knocked on the basement door, the door opened, and he was shot at." (*Id.* ¶¶ 17–18.)

The petitioner was charged with two misdemeanors — criminal trespass in the second and third degrees, (N.Y.S. Penal Law Sections 140.15(1) and 140.10(A)) — and with trespass, a violation (N.Y.S. Penal Law Section 140.05). (*Id.* ¶ 19.) He was arraigned and released on his own recognizance. (Blackett 56.1 ¶ 47.) In March 2020, the plaintiff accepted an adjournment

---

[10] The Department of Corrections investigated the incident and found that Blackett acted in accordance with its rules and regulations. (Blackett 56.1 ¶ 50.) Blackett was not disciplined, and the Department of Corrections returned his gun when the investigation closed in 2023. (*Id.*)

[11] Officer Yardan is not a defendant in this case.

in contemplation of dismissal.  (*Id.* ¶ 48; Officer Defs. 56.1 ¶ 20.)   The plaintiff's case was dismissed on March 2, 2020.  (ECF No. 87-8.)

## II.     Procedural History

The plaintiff brought this action against Blackett, the Officer Defendants, the City of New York, DOC Commissioner Louis Molina, and fifteen John and Jane Doe NYPD Officers on November 8, 2022.  (ECF No. 1.)  The plaintiff asserted 21 federal and state claims, and alleged that Blackett and NYPD officers conspired together to arrest him unlawfully on trespassing charges.  (*Id.*)

On February 28, 2024, the plaintiff moved to amend the complaint and join new parties. (ECF No. 30.)  On April 26, 2024, after multiple extensions of time, the parties certified that discovery was complete.  (*ECF Order dated Apr. 26, 2024*.)  On May 31, 2024, Magistrate Judge Joseph Marutollo issued an amended *sua sponte* report and recommendation in which he recommended that the Court grant in part and deny in part the plaintiff's motion to amend the complaint.  (ECF No. 53.)[12]  Judge Marutollo recommended that the Court grant the plaintiff's motion except "to the extent that [the p]laintiff seeks to assert additional facts against Officers Hussein and Link in support of claims that are ultimately time-barred" or "seeks to name Officers Hussein and Link as defendants in the caption."  (*Id.* at 25.)  On July 9, 2024, the Court adopted Judge Marutollo's amended report and recommendation and granted the plaintiff leave to amend, consistent with the amended report and recommendation.  (ECF No. 56.)  On September 15, 2024, the plaintiff filed an amended complaint raising the same 21 federal and

---

[12] Judge Marutollo issued a *sua sponte* report and recommendation, recommending that the Court grant in part and deny in part the plaintiff's motion to amend on April 2, 2024.  (ECF No. 40.)

state claims, but removing the John and Jane Doe defendants and replacing Commissioner Molina with the current DOC Commissioner, Lynelle Maginley-Liddle.  (ECF No. 62.)

At a pre-motion conference on November 21, 2024, the plaintiff agreed to withdraw his municipal liability claim, as well as all claims against the City of New York and Commissioner Maginley-Liddle.  (*ECF Minute Entry dated Nov. 21, 2024.*)

On June 6, 2025, Blackett moved for summary judgment (ECF No. 77), and the Officer Defendants moved for summary judgment and to dismiss the amended complaint (ECF No. 83). The plaintiff opposed the motions on August 15, 2025.  (ECF No. 88.)

## LEGAL STANDARD

### I.    Motion for Summary Judgment

Summary judgment is appropriate if the parties' submissions — including pleadings, deposition transcripts, affidavits, and other material in the record — show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A fact is material if it 'might affect the outcome of the suit under the governing law,'" and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The movant has the burden of demonstrating that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (citation omitted).

A court "may find for the moving party 'only if [it] conclude[s] that on the record presented, considered in the light most favorable to the non-moving party, no reasonable fact-

8

finder could find in its favor.'" *Roberts v. Genting N.Y. LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (citation modified) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 54–55 (2d Cir. 2005)). A court does not consider whether "the evidence unmistakably favors one side or the other but whether a fair-minded fact-finder could return a verdict for the non-moving party on the evidence presented." *Id.* (citation modified) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

**DISCUSSION**

**I.      Claims against the Officer Defendants**

    **a.  Claims Against Officer Redhead**

The Officer Defendants argue that Officer Redhead is entitled to summary judgment because the plaintiff has not alleged or established his personal involvement. (ECF No. 83 at 18–19.) "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (citation omitted).

In the 56.1 statements, the parties agree that Officer Redhead advised the plaintiff of his rights and then questioned him, and that the plaintiff made statements about what happened. (Officer Defs. 56.1 ¶¶ 17–18; *see also* Blackett 56.1 ¶ 45.) This is supported by the facts in the record, which establish that Officer Redhead advised the plaintiff of his rights when the plaintiff returned to the precinct from the hospital; the plaintiff agreed to answer questions, and then told Officer Redhead that he went to 991 Avenue N to clean the basement, knocked on the basement door, and "was shot at." (ECF No. 87-6 at 3.) There is no evidence in the record that Officer Redhead was at the building when the plaintiff was arrested, or at the precinct when the plaintiff first arrived. And based on these facts, as explained below with respect to Officer Gourlay, no

9

reasonable fact-finder could find for the plaintiff on his false arrest and illegal imprisonment, malicious prosecution, due process, denial of a fair trial, conspiracy, and deliberate indifference claims against Officer Redhead.

Although the plaintiff did not make specific allegations against Officer Redhead in the amended complaint, he alleges for the first time in his opposition that Officer Redhead "investigated the incident, learned that Mr. Watt was being framed to cover up Blackett's shooting, conducted a videotaped interrogation of Mr. Watt, and joined the conspiracy to cover up the attempted murder and fabricate false charges." (ECF No. 88 at 20.)  He also claims that Officer Redhead "los[t] or destroy[ed] the video he created." (*Id.*)  "It is settled law that a 'Plaintiff may not properly raise new allegations in his opposition to Defendants' motion for summary judgment.'" *Cheng v. Via Quadronno LLC*, No. 20-CV-8903, 2022 WL 17069800, at *6 (S.D.N.Y. Nov. 17, 2022) (quoting *Brutus v. Silverseal Corp.*, 2009 WL 4277077, at *1 n.2 (S.D.N.Y. Nov. 24, 2009)).  Moreover, the plaintiff points to no evidence in the record to support these allegations, and "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); *see also BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (holding that conclusory allegations without supporting facts are "insufficient to raise a triable issue of material fact").  Accordingly, Officer Redhead is entitled to summary judgment on all of the plaintiff's claims against him.

The plaintiff argues that the Court should let him amend the complaint "solely for the purposes of adding this paragraph to clarify the issue." (ECF No. 88 at 36.)  It is not clear to which "paragraph" the plaintiff refers, but in any case, amendment at this late stage is not appropriate.  When a plaintiff seeks to amend his complaint before trial, "[t]he court should

10

freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  Leave to amend may be denied, however, based on "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  "Under this standard, courts generally do not allow amendments proposed in the course of summary judgment motions." *McNeill v. Jordan*, No. 14-CV-2872, 2017 WL 2955763, at *7 (E.D.N.Y. July 11, 2017) (citing *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407–08 (S.D.N.Y. 2000) (collecting cases)); *see also Williams v. Bank Leumi Tr. Co. of New York*, No. 96-CV-6695, 2000 WL 343897, at *2 (S.D.N.Y. Mar. 31, 2000) ("A motion to amend a complaint is particularly disfavored where the amendment is proposed in response to a summary judgment motion.").  The Court permitted the plaintiff to amend his complaint once, after the close of discovery.  (*See* ECF Nos. 53, 56, 62.)  At that point, which was already quite late, the plaintiff knew what the factual record showed, but did not amend his claims about Officer Redhead.  He is not entitled to do so at this stage of the litigation.

### b.  Remaining Federal Claims

The plaintiff brings the following federal claims against Officer Gourlay:[13]

---

[13]  After he amended his complaint, the plaintiff dismissed the municipal liability claim and "all claims against the City of New York and New York City Department of Correction Commissioner Lynelle Maginley-Liddie." (*ECF Minute Entry dated Nov. 21, 2024.*)  The Officer Defendants state that they understand the plaintiff's false arrest and illegal imprisonment, malicious prosecution, denial of a fair trial, conditions of confinement, deliberate indifference to medical needs, and conspiracy claims to be the "entire universe of Plaintiff's claims against them." (ECF No. 83 at 17–18.)  The amended complaint, however, also includes claims for "cruel and unusual punishment," failure to intervene, and failure to protect." (ECF No. 62 ¶¶ 74–75, 79–85.)  It is not clear which claims the plaintiff is asserting against which defendants, or which claims he dismissed when he dismissed his claims against the City of New York and the DOC Commissioner.  He does not argue that the Officer Defendants — or Blackett — are liable for the cruel and unusual punishment, failure to intervene and failure to protect claims; he says that the defendants "are liable for all of the claims in this matter: the false arrest and conspiracy charges, malicious prosecution, denial of a fair trial, lack of timely and proper medical care,

- False arrest and "illegal imprisonment" (ECF No. 62 ¶¶ 35–38), and violations of the Fourth and Fourteenth Amendments for "illegally arrest[ing] plaintiff subjecting him to unlawful search and seizure, false arrest, imprisonment and deprivation of liberty, [and] destruction of property, without probable cause" (*id.* ¶¶ 50–55);

- Malicious prosecution, for "caus[ing] a false accusatory instrument to be filed against plaintiff, initiat[ing] a prosecution against him, and d[oing] so without probable cause" (*id.* ¶¶ 59–62);

- Denial of a fair trial (*id.* ¶¶ 70–73);

- Violation of the plaintiff's due process rights based on the conditions of his confinement (*id.* ¶¶ 63–69);

- Deliberate indifference to the plaintiff's medical needs, for "refus[ing] to call for medical attention in a timely manner at the scene," "cho[osing] to drive to the precinct instead of a medical facility," and "cho[osing] to hold [the plaintiff], shackled, inside a cell instead of providing immediate medical assistance" (*id.* ¶¶ 103–107); and

- Conspiracy to "racially profile plaintiff, and to cover up [the defendants'] false arrest and their violations of plaintiff's rights" (*id.* ¶¶ 76–78).

    i. *False Arrest*

"To prevail on a claim for false arrest, a plaintiff must plead that '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the

_____

and all the other related claims." (ECF No. 88 at 37.)  Accordingly, the Court does not address the plaintiff's cruel and unusual punishment, failure to intervene, or failure to protect claims.

plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Othman v. City of New York*, No. 13-CV-4771, 2018 WL 1701930, at \*10 (E.D.N.Y. Mar. 31, 2018) (quoting *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).

"The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant*, 101 F.3d at 852). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Russell v. The J. News*, 672 F. App'x 76, 80 (2d Cir. 2016) (summary order) (quoting *Weyant*, 101 F.3d at 852). "Even without probable cause to arrest, 'an arresting officer [is] entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest.'" *Id.* (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Escalera*, 361 F.3d at 743 (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). "The test for qualified immunity is 'more favorable to the officers than the one for probable cause.'" *Russell*, 672 F. App'x at 80 (quoting *Escalera*, 361 F.3d at 743).

13

The police arrested the plaintiff and charged him with criminal trespass in the second degree.  (ECF No. 81-2.)  "A person is guilty of criminal trespass in the second degree when he or she knowingly enters or remains unlawfully in a dwelling."  New York Penal Law § 140.15.  Moreover, "[a] person 'enters or remains unlawfully' in or upon premises when he is not licensed or privileged to do so."  *Id.* § 140.00(5).

The Officer Defendants argue that they had probable cause to arrest the plaintiff for trespass because Blackett told them when they arrived at the building  "(1) that [he] was the owner of the building; (2) that Mr. Blackett was inside of the basement of the property, which is not rented or leased out, and which therefore remains Mr. Blackett's exclusive property; and (3) that Plaintiff, who does not live at 9109 Avenue N, was inside the house and attempted to enter (and did enter) the basement where he was not permitted to be."  (ECF No. 83 at 21.)  The plaintiff does not dispute that he entered the basement, or that Blackett owned the house — including the basement — and "did not give Plaintiff permission or authority to enter or remain in the basement."  (Officer Defs. 56.1 ¶¶ 7, 9.)  Nor does he deny that Blackett told the officers that the plaintiff came into the basement, that it was locked, that Blackett was the only one who had access to it, and that his tenant had been "invit[ing] his friends over to go downstairs to the basement apartment to smoke, or drink, and other activities of the sort, breaking through the door and entering private property."  (Blackett 56.1 ¶ 21.)  Nevertheless, the plaintiff claims that Officer Gourlay did not have probable cause to arrest him, because he heard competing versions of what happened, and should have believed the plaintiff, not Blackett.  (*See* ECF No. 88 at 26–29.)

"[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness . . . unless the circumstances raise

doubt as to the person's veracity." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation modified). The Second Circuit has "found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee." *Wieder v. City of N.Y.*, 569 F. App'x 28, 29–30 (2d Cir. 2014) (summary order) (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 70 (2d Cir. 2001)). Blackett, the property owner and an "eyewitness" to the crime, told Officer Gourlay that the plaintiff trespassed on his property. When a property owner confirms to a police officer that someone does not have permission or authority to be at the property, the officer has probable cause to arrest that person for criminal trespass. *See Walston v. City of New York*, 754 F. App'x 65, 66 (2d Cir. 2019) (summary order). That is what happened here. Accordingly, Officer Gourlay had probable cause to arrest the plaintiff for trespassing.

According to the plaintiff, however, Officer Gourlay should not have listened to Blackett, because the officer also learned that the plaintiff was Erskine's guest, that there was a "dispute" between Blackett and his tenants about the basement, and that the plaintiff "had no knowledge of the dispute or that the basement may have been off limits." (ECF No. 88 at 28.)[14] The plaintiff denies that Officer Gourlay had probable cause because he "knew, prior to any charges being filed against Mr. Watt, that [Mr. Erskine] admitted to using the basement and that Mr. Watt was invited to come over to help clean the basement. In other words, Gourlay learned that this was a landlord tenant dispute over a particular area of the residence, and that the invited guest had no knowledge of the dispute or that the basement may have been off limits." (ECF No. 88 at 28.) However, as the Second Circuit explained in a similar case, "[u]nder New York law, this belief

---

[14] Footage from the body-worn camera refutes the plaintiff's "dispute" claim — it shows that Erskine admitted to the police that he did not have permission to be in the basement. (Officer Morris Body-Worn Camera Footage at 6:40–6:47.) As explained below, it would not matter for probable cause purposes if the plaintiff genuinely believed that Erskine was allowed to be in the basement.

15

might have provided him a defense against the trespass charge at trial . . . [h]owever, it has no bearing on whether [the NYPD] had probable cause to arrest him for trespassing." *Davis v. City of New York*, 840 F. App'x 631, 634 (2d Cir. 2021) (summary order) (citation omitted). Accordingly, Officer Gourlay is entitled to summary judgment on the plaintiff's false arrest claim. As explained above, a police officer confronted with different versions of events is not charged with deciding who is ultimately right; his job is to determine whether there was probable cause to arrest. *See Wilson v. City of New York*, No. 18-CV-7301, 2020 WL 5709200, at *4 (E.D.N.Y. Sept. 24, 2020) ("[T]he officer made a reasonable decision to apprehend [the person] suspected of wrongdoing even if he did not have enough information to make a final determination of guilt by weighing the evidence, and even though he was presented with different stories from an alleged victim and the arrestee." (citation modified)).

### ii. Malicious Prosecution

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (citation modified). The existence of probable cause is a "complete defense" to a malicious prosecution claim. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).

16

As explained above, Officer Gourlay had probable cause to arrest the plaintiff. "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.'" *Johnson v. Constantellis*, 221 F. App'x. 48, 50–51 (2d Cir. 2007) (summary order) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003)). "The burden is on the plaintiff to show that additional facts have come to light that negate an initial finding of probable cause." *Dispenza v. City of New York*, No. 19-CV-5645, 2023 WL 11845608, at *17 (E.D.N.Y. Mar. 7, 2023). While the plaintiff maintains that the defendants did not have probable cause to arrest him in the first place (ECF No. 88 at 32), he does not cite any facts showing that "between the time of his arrest and his court appearance, the authorities became aware of 'evidence exonerating the accused,' and yet continued to prosecute him." *Dispenza*, 2023 WL 11845608, at *18 (quoting *Collom v. Incorporated Vill. of Freeport, N.Y.*, 691 F. Supp. 637, 640 (E.D.N.Y. 1998)). Accordingly, Officer Gourlay is also entitled to summary judgment on the malicious prosecution claim.

### iii. Denial of Right to Fair Trial

To prevail on right to a fair trial claim, a plaintiff must demonstrate that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.").

In his opposition, the plaintiff argues that the defendants "fabricated evidence against Mr. Watt, including but not limited to the Criminal Complaint and TWO separate Supporting Depositions against him." (ECF No. 88 at 32.)  The criminal complaint includes a sworn statement from Officer Gourlay that he was informed by Blackett, the building's landlord, that Blackett "observed [the plaintiff] inside the basement," and that the plaintiff "did not have permission or authority to enter or remain therein." (ECF No. 87-2.)  Blackett's sworn supporting deposition states that he observed the plaintiff inside 9101 Avenue N, that he was the "custodian" of the building, and that the plaintiff "did not have permission or authority to enter or remain in those premises." (ECF No. 87-3 at 1.)  The plaintiff does not claim that this information was fabricated.  As explained above, the plaintiff does not dispute that Blackett was the landlord, or that he entered the basement at 9101 Avenue N without Blackett's permission. (*See* Officer Defs. 56.1 ¶¶ 6–7, 9.)  Accordingly, the defendants are entitled to summary judgment on the plaintiff's denial of right to a fair trial claim.  *See Saheed v. City of New York*, No. 17-CV-1813, 2020 WL 1644006, at *12 (S.D.N.Y. Apr. 2, 2020) (granting summary judgment on denial of right to fair trial claim where "there is no dispute of material fact concerning whether the remaining alleged fabrications . . . are indeed fabrications").

### iv.  Denial of Medical Care

The plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs three separate times: (1) at the scene of his arrest, when they "refused to call for medical attention in a timely manner;" (2) when they "chose to drive to the precinct instead of a medical facility;" and (3) when the defendants "chose to hold him, shackled, inside a cell instead of providing immediate medical assistance." (ECF No. 62 ¶¶ 105–107.)

The plaintiff's claims — that the defendants denied him adequate medical care as a pretrial-detainee — are governed by the Due Process Clause of the Fourteenth Amendment, not the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To defeat summary judgment, the plaintiff must show "(1) he was suffering from a 'serious medical need' that could 'produce death, degeneration, or extreme pain,' and (2) the defendant officers 'acted with deliberate indifference to such needs.'" *Hickman v. Endeavers*, No. 24-CV-2082, 2025 WL 965216, at *2 (S.D.N.Y. Mar. 31, 2025) (quoting *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019)).

As to the first prong, "[t]he serious medical needs standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles*, 925 F.3d at 86. It is "objective in nature and requires allegations that suggest that the detainee was subject to conditions posing a substantial risk of serious harm." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 395 (S.D.N.Y. 2020) (citation modified). To determine whether a medical need is "sufficiently serious," courts in the Second Circuit "consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects an individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles*, 925 F.3d at 86 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003)).

To satisfy the second prong, the plaintiff must show "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to

mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Charles*, 925 F.3d at 87.

The plaintiff does not dispute that he refused medical attention three times at the scene, or that the officers at the scene "tried to assist him." (Blackett 56.1 ¶ 33.) Nor could he do so persuasively, since the body-worn camera footage shows that one officer told the plaintiff, shortly after they got to the building, "If you like, we'll get you to a hospital," and that another officer asked the plaintiff twice if he needed an ambulance. (Officer Morris Body-Worn Camera Footage at 4:30–4:58.) Just five minutes later, the same officer checked in again, telling the plaintiff, "I know I asked before and you didn't answer me — do you want an ambulance?" (*Id.* at 9:57–10:02.) That officer and another officer followed up multiple times to confirm that the plaintiff did not want an ambulance. (*Id.* at 10:02–10:16.) When the plaintiff asked to wash his eyes out, officers asked Erskine's mother to bring him a paper towel and water. (Blackett 56.1 ¶ 23; Officer Defs. 56.1 ¶ 13; Officer Yardan Body-Worn Camera Footage at 1:15–1:35.)

There is no evidence in the record that the plaintiff asked for medical treatment while he was being transported to the precinct. He testified at his deposition that the first time he asked for medical attention was at the precinct. (ECF No. 76-6 ("Watt Deposition Tr.") at 46:8-14; *see also* Officer Defs. 56.1 ¶ 14.) He also testified that at that point, his right eye "was shut and couldn't open," that it "felt like glass was in [his] eye," he "felt things moving in [his] right eye," and "[a]round [his] eye felt hot, like an iron was placed on it." (Watt Deposition Tr. at 48:6-20.) The plaintiff also agrees that the police called for an ambulance for him, and that he went to the hospital 30 minutes after he got to the precinct. (Officer Defs. 56.1 ¶ 15.) At the hospital, a doctor removed pieces of "gun-shot related debris" from the plaintiff's eye, and prescribed eye

drops.  (ECF No. 91-1 at 14–15.)  The plaintiff was discharged from the hospital, and the police took him back to the precinct.  (Officer Defs. 56.1 ¶ 16; *see also* Blackett 56.1 ¶ 45.)  He had one follow-up appointment with a nurse at a clinic.  (Watt Deposition Tr. at 62:24–64:11.)  The nurse gave him eye drops and instructed him to use them if his eye irritated him.  (*Id.* at 63:16-21.)

Nothing in the record suggests that the plaintiff's injury significantly affected his daily activities or caused him "chronic and substantial pain."  *Charles*, 925 F.3d at 86.  "When determining if a delay in treatment led to 'sufficiently serious' harm, 'the actual medical consequences that flow from the alleged denial of care will be highly relevant.'"  *Smith v. City of New York*, 15-CV-7910, 2016 WL 7471334, at *4 (S.D.N.Y. Dec. 28, 2016) (quoting *Carpenter*, 316 F.3d at 187).  There are no facts in the record to support that a delay in taking the plaintiff to the hospital — even assuming that there was a delay — exacerbated his eye injury.  "[W]here a delay in providing medical attention is neither the underlying cause of a plaintiff's condition nor contributed to a worsening in the condition, courts have found that the objective prong of a deliberate indifference claim is not met."  *Id.* (collecting cases).[15]  Therefore, the plaintiff has not shown that he was suffering from a sufficiently serious medical need.

Moreover, no reasonable jury could find that Officer Gourlay acted with deliberate indifference.  The plaintiff refused offers of medical treatment multiple times, and officers made sure he had water to rinse out his eye.  When he asked for medical help at the precinct, the police got him to the hospital within 30 minutes.  "Courts within this Circuit have generally limited findings of deliberate indifference to far more extreme delays in treatment—'cases in which, for

---

[15] Smith asserted a claim for denial of medical care under the Eighth Amendment, but "the first prong of the deliberate indifference inquiry is the same under both [the Fourteenth and Eighth] amendments; only the second prong, focusing on *mens rea*, differs."  *Singletary v. Russo*, 377 F. Supp. 3d 175, 188 n.2 (E.D.N.Y. 2019) (citing *Darnell*, 849 F.3d at 35–36).

example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years.'" *Est. of Richards by Stephens v. City of New York*, 18-CV-11287, 2024 WL 3607220, at *11 (S.D.N.Y. July 31, 2024), (quoting *Ridge v. Davis*, 18-CV-8958, 2022 WL 357020, at *14 (S.D.N.Y. Feb. 7, 2022)), *appeal withdrawn*, No. 24-2147, 2025 WL 470710 (2d Cir. Jan. 23, 2025).   In short, there is no factual basis for the plaintiff's denial of medical care claim.

> v. *Due Process Claim Regarding Conditions of Confinement*

To establish a conditions of confinement due process claim, the plaintiff must meet the same two-pronged test discussed above. *See Smith v. Westchester Cnty.*, No. 19-CV-3605, 2021 WL 2856515, at *7 (S.D.N.Y. July 7, 2021).   The plaintiff asserts that the defendants "denied [him] food and water at the precinct." (ECF No. 62 ¶ 64.)   He also says that they "handcuffed [him] forcibly too tightly and for a length of time in violation of his rights, without justification or cause." (*Id.* ¶ 67).[16]

There is no evidence in the record to support the plaintiff's excessive handcuffing claim. Indeed, as the defendants point out, this claim is "plainly disproved by Plaintiff's own testimony." (ECF No. 83 at 31.)   In his deposition, the plaintiff testified that after he complained about the handcuffs being too tight "[t]he moment they put it on," the officers "loosened it a little bit." (Watt Deposition Tr. at 43:5-12.)   After officers loosened the handcuffs, the plaintiff felt better and did not complain about them again. (*Id.* at 43:13-44:2.)   The plaintiff does not point to contrary evidence in the record; instead, he maintains that the Officer Defendants' arguments

---

[16] The plaintiff also alleges a due process conditions of confinement claim based on "improper unreasonable search without justification or cause" and his denial of medical treatment. (ECF No. 62 ¶¶ 65–66.)   These claims are duplicative of the false arrest and denial of medical treatment claims, discussed above.   Accordingly, the Court does not address them here.

22

about the "unnecessarily violent tightening of handcuffs" are "without merit."  (ECF No. 88 at 35.)  "Once the moving party has brought out facts demonstrating that the opposing party's claims cannot be sustained, in order to survive the summary judgment motion, the opposing party must establish a genuine issue of fact by 'citing to particular parts of materials in the record.'"  *Iacona v. JP Morgan Chase Bank, N.A.*, No. 12-CV-2330, 2012 WL 2885491, at *3 (E.D.N.Y. July 13, 2012) (quoting Fed. R. Civ. P. 56(c)(1)).  Further, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation modified).  Accordingly, the Officer Defendants are entitled to summary judgment on the plaintiff's conditions of confinement claim based on the allegedly excessive handcuffing.

The Officer Defendants also argue that there is no evidence in the record to support that they denied the plaintiff food and water at the precinct.  (ECF No. 83 at 30.)  In his opposition, the plaintiff does not cite any facts to support this claim.  (*See* ECF No. 88 at 35.)  "To overcome a motion for summary judgment where the moving party has pointed to a lack of evidence in support of an essential element of the nonmoving party's claim, the nonmoving party must come forward with 'specific evidence' to demonstrate 'the existence of a genuine dispute of material fact.'"  *McCree v. City of New York*, No. 21-CV-2806, 2025 WL 895467, at *8 (E.D.N.Y. Mar. 24, 2025) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  Because the plaintiff has not done so, the Officer Defendants are also entitled to summary judgment on his conditions of confinement claim based on the plaintiff's alleged denial of food and water at the precinct.

vi.    *Conspiracy to Violate the Plaintiff's Civil Rights*

To establish a Section 1983 conspiracy, plaintiff must prove "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999). "A § 1983 conspiracy claim based on conclusory allegations and unsubstantiated statements may not withstand a summary judgment motion where 'the record is devoid of any proof of an agreement among Defendants to act in concert to violate Plaintiff['s] constitutional rights.'" *Mitchell v. Cnty. of Nassau*, 786 F. Supp. 2d 545, 564 (E.D.N.Y. 2011) (quoting *Rose v. Julliano,* 2008 WL 5233178, at *7 (E.D.N.Y. Dec. 8, 2008)).

In an effort to buttress his conspiracy claim, the plaintiff cites the following facts: that "Blackett and the NYPD walked through the basement crime scene together, all while Blackett provided his version of events and pointed out areas he deemed important to defend his actions" (ECF No. 88 at 14), and that Blackett "was advised by the police at the scene to 'contact his union delegate'" (ECF No. 88 at 13 (quoting Blackett 56.1 ¶ 21)).  These facts do not establish a conspiracy.  Rather, they show that the police, responding to a 911 call, were doing an investigation.  As part of that investigation, and as the body-worn camera footage shows, Lieutenant Hussein — not a defendant in this case — was in the basement with other officers, including Officer Yardan, in an effort to locate ballistics evidence.  (*See* Lieutenant Hussein Body-Worn Camera Footage at 4:00–4:20; Blackett 56.1 ¶ 29.)  After another officer said, "We're gonna need him to show us where this round went off," (Lieutenant Hussein Body-Worn Camera Footage at 4:15–4:18), the lieutenant directed officers to bring Blackett downstairs, which they did, (*id.* at 4:35–4:45).  In an interaction that lasted about a minute, the lieutenant

24

asked Blackett where he "let the round go," and Blackett described what happened. (*Id.* at 5:15–6:16.)

The parties agree that Officer Yardan told Blackett to contact his union delegate. (*See* Blackett 56.1 ¶ 21.) No rational jury could conclude that this exchange was an agreement between the Officer Defendants and Blackett to violate the plaintiff's constitutional rights. Accordingly, Officer Gourlay is entitled to summary judgment on the plaintiff's Section 1983 conspiracy claim.

## II.    Claims against Blackett

Blackett maintains that he is entitled to summary judgment on the federal claims because he was not a state actor. (ECF No. 77 at 18–23.) He says that even if he was a state actor, the Court should grant summary judgment on the conspiracy and excessive force claims. (*Id.* at 24–25.) Finally, he asks the Court not to exercise supplemental jurisdiction over the state law claims. (*Id.* at 28–29.) As explained below, a reasonable juror could conclude that Blackett was acting under state law. Accordingly, summary judgment is not appropriate on this basis. The Court does, however, grant summary judgment on the conspiracy claim.

### a.  Federal Claims

#### i.  State Actor

Blackett argues that he is entitled to summary judgment on the federal claims because he was not "acting under the color of law." (ECF No. 77 at 18.) A plaintiff claiming a Section 1983 violation must allege: "(1) that the challenged conduct was 'committed by a person acting under color of state law'; and (2) that such conduct 'deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Gazzola v. Cnty. of Nassau*, No. 16-CV-909, 2016 WL 6068138, at *4 (E.D.N.Y. Oct. 13, 2016) (quoting *Cornejo v.*

25

*Bell*, 592 F.3d 121, 127 (2d Cir. 2010)).  "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation modified).

"[W]hile it is clear that 'personal pursuits' of police officers do not give rise to section 1983 liability, there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994).  Accordingly, "[m]ore is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred," and "courts look to the nature of the officer's act, not simply his duty status." *Id.* (citing *Rivera v. La Porte,* 896 F.2d 691, 695–96 (2d Cir.1990)).  "In analyzing whether an off-duty police officer acted under the color of law, courts consider whether the officer: (1) was off-duty; (2) identified himself as an officer of the law; (3) was in uniform; (4) was authorized to make an arrest at the time; (5) was carrying handcuffs; (6) was carrying any weapons; (7) flashed a police badge; and (8) placed the plaintiff under arrest or otherwise detained him." *Cooper v. City of New York*, No. 17-CV-1517, 2018 WL 4762248, at *6 (E.D.N.Y. Sept. 29, 2018) (citation omitted).  The Second Circuit has also held that "when an officer identifies himself as a police officer and uses his service pistol, he acts under color of law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).

There is no dispute that Blackett was an off-duty corrections officer who owned and used a firearm.  (Blackett 56.1 ¶ 12.)  Nor is there any dispute that Blackett "yell[ed] that he was an Officer" as the basement door opened.  (*Id.* ¶ 13.)  In addition, Blackett's fiancée identified Blackett as an officer when she called 911.  (ECF No. 76-1 ¶ 12).  Blackett also told the responding police officers that he was a corrections officer, and showed them his identification. (*Id.* ¶ 15.)

26

There is a factual dispute about whether Blackett tried to handcuff the plaintiff (*see* Blackett 56.1 ¶ 39), but Blackett does not deny that he had handcuffs when he encountered the plaintiff (*see* ECF No 77 at 22).  According to the plaintiff, Blackett pointed his gun at the plaintiff's head after the gun went off, and dragged him into the stairwell.  (Watt Deposition Tr. at 28:7-15, 93:12-21.)  The plaintiff also says that Blackett held him, Erskine, Erskine's sister, and Erskine's mother at gunpoint until the police arrived.  (*Id.* at 35:17–36:12).  Moreover, there is no dispute that Blackett stood outside the door, holding his gun, before the police arrived, while the plaintiff and Erskine sat on the staircase just inside the door.  (Blackett 56.1 ¶ 19.)[17] On the other hand, Blackett was not wearing his uniform, (*see* Officer Hussein Body-Worn Camera Footage at 5:15–5:20), and did not show his identification until the police arrived (*see* ECF No. 88 at 24).

Considering the record in the light most favorable to the plaintiff, as the Court must on the defendants' motion for summary judgment, a reasonable fact-finder could conclude that Blackett was acting under color of state law.  In *Rivera v. La Porte*, an off-duty corrections officer was carrying handcuffs and his off-duty revolver when he arrested the plaintiff after a personal dispute.  896 F.2d at 696.  The Second Circuit held that the officer was acting under color of law, because although "the dispute that precipitated the arrest was private, the response, including the arrest and the use of excessive force, was unquestionably action under color of law." *Id.*  It is true that the officer in *Rivera* did more than Blackett did here; that officer "placed [the plaintiff] in a police car, and he accompanied him throughout the evening to the local precinct, the hospital, and central booking." *Id.*  Nevertheless, Blackett identified himself as a

---

[17] Blackett was a peace officer authorized to make arrests.  *See Rivera*, 896 F.2d at 696; *see also Dudley v. Pendergrass*, No. 06-CV-216, 2009 WL 10705735, at *4 (E.D.N.Y. Sept. 25, 2009).

corrections officer, he was carrying handcuffs, and "use[d] his service pistol." *Tavernier*, 316 F.3d at 134.

Nor is it dispositive that the plaintiff might not have known that Blackett was a corrections officer "until he saw Blackett identify himself to the NYPD responding officers." (ECF No. 77 at 21.)  The plaintiff says that he "had the opportunity to hear Blackett yell 'Officer' before the shooting." (ECF No. 88 at 23.)[18]  Regardless, "a person's subjective reaction to the conduct at issue is not relevant to determining whether an officer acted under color of state law." *Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 516 (E.D.N.Y. 2021) (rejecting argument that plaintiffs bringing Section 1983 claims were not aware that the defendants were police officers); *see also Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 476 (E.D.N.Y. 2002) ("Although [the plaintiff] does not claim to have believed that [the defendant] was a police officer at this point, [the plaintiff's] subjective reaction to [the defendant's] conduct is not relevant to determining whether [the defendant] was acting under color of state law.").  Accordingly, a rational jury could conclude that Blackett was acting under color of state law, and his motion for summary judgment on these grounds is denied.

### ii. Excessive Force Claim[19]

Blackett argues that even if he was a state actor, the plaintiff "has failed to show the injuries from the alleged excessive force claims were the result of an intentional act." (ECF No.

---

[18] At his deposition, the plaintiff testified that Blackett did not say anything before he fired the gun.  (Watt Deposition Tr. at 27:8-12, 99:8-9.)

[19] It is unclear from the amended complaint whether the plaintiff's excessive force claim arises under the Fourth or Fourteenth Amendments.  However, "it is undisputed that plaintiff had not yet been arraigned, so his [excessive force] claim is governed by the Fourth Amendment." *Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, at *4 (E.D.N.Y. Mar. 8, 2011) (citing *Sloane v. Kraus*, No. 06-CV-5372, 2010 WL 3489397, at *10 (S.D.N.Y. Sept. 3, 2010); *Santiago v. City of New York,* 2000 WL 1532950, *4 (S.D.N.Y. Oct.17, 2000)).

77 at 25.)  The Second Circuit has held that to establish a Fourth Amendment excessive force claim, a plaintiff must "point to unreasonable intentional action taken that proximately caused the injury," though "no additional intent to injure is required."  *Dancy v. McGinley*, 843 F.3d 93, 118 (2d Cir. 2016).  Blackett's version is that the plaintiff "grabbed" his gun and "attempted to disarm" him; the plaintiff then "grabbed Blackett's right hand and wrist" and "[d]uring the struggle, Blackett's [gun] accidentally discharged one shot."  (Blackett 56.1 ¶ 14.)  The plaintiff, on the other hand, says that he did not push Blackett or grab his gun, and that Blackett shot him. (*See id.*; Watt Deposition Tr. at 102:17–103:4).  Accordingly, there is a genuine dispute of material fact as to whether the use of force in this case was intentional.

Blackett also says that summary judgment is warranted because the plaintiff's injuries were "*de minimis*."  (ECF No. 77 at 24–25.)  The Second Circuit has not decided whether the *de minimis* injury standard sometimes applied in Eighth Amendment excessive force cases also applies in the Fourth Amendment context.  *Lopez v. City of New York*, No. 15-CV-7292, 2018 WL 2744705, at *7 (E.D.N.Y. June 7, 2018) ("There is no binding precedent, however, that requires plaintiff to show more-than-de-minimis force or injury to prevail on a Fourth Amendment excessive force claim."); *see also Rizk v. City of New York*, 462 F. Supp. 3d 203, 224 (E.D.N.Y. 2020).  District court in this circuit, however, have declined to dismiss Fourth Amendment excessive force claims on these grounds.  *See Rizk*, 462 F. Supp. 3d at 223–24 (collecting cases).  Under these circumstances, the Court declines to dismiss the plaintiff's excessive force claims.

### iii.  Conspiracy Claim

As explained above, the Court granted the Officer Defendants' motion for summary judgment on the conspiracy claim, because no reasonable fact-finder could find that the Officer

Defendants conspired with Blackett to violate his civil rights.  Thus, even if Blackett were a state actor, there was no constitutional violation.  Accordingly, Blackett is entitled to summary judgment on the plaintiff's conspiracy claim.

### b.  State Law Claims

"Should the Court dismiss Plaintiff's federal claims," Blackett asks it to "decline to exercise supplemental jurisdiction over Plaintiff's state law claims."  (ECF No. 77 at 28.)  As discussed above, the Court does not grant Blackett's motion for summary judgment on all of the plaintiff's federal claims.  Accordingly, his request that the Court decline to exercise supplemental jurisdiction over the plaintiff's state law claims is denied. [20]

---

[20] Because the Court does not dismiss the plaintiff's federal claims against Blackett, it does not address his state law claims.

**CONCLUSION**

For these reasons, the Court grants the Officer Defendants' motion for summary judgment on all of the plaintiff's claims against Officer Redhead, and grants summary judgement on all of the plaintiff's claims against Officer Gourlay.  The Court grants Blackett's motion for summary judgment on the conspiracy claim, but denies his motion on the other federal claims.[21]


**SO ORDERED.**

                              s/Ann M. Donnelly
                    _____
                              ANN M. DONNELLY
                              United States District Judge


Dated: Brooklyn, New York
        March 16, 2026

---

[21] Blackett maintains that "[r]eviewing the [amended complaint] as it applies to defendant Blackett, Plaintiff's claims can be distilled to: false arrest; false imprisonment; malicious prosecution; excessive force; and conspiracy."  (ECF No. 77 at 16 n.2.)  Blackett styled his motion as a motion for summary judgment on all of the plaintiff's federal claims on the grounds that he was not a state actor, but he moved substantively only on the conspiracy and excessive force claims.  The plaintiff maintains that "Defendants are liable for all of the claims in this matter: the false arrest and conspiracy charges, malicious prosecution, denial of a fair trial, lack of timely and proper medical care, and all the other related claims."  (ECF No. 88 at 37.)  The Court does not determine whether Blackett is entitled to summary judgment on the rest of the plaintiff's federal claims because he did not specifically move for summary judgment on them or discuss them in his brief. *See Braithwaite v. Kingsboro Psychiatric Ctr.*, No. 07-CV-127, 2009 WL 2596486, at *6 (E.D.N.Y. Aug. 21, 2009) ("This claim was not addressed by Defendants' Motion; therefore, the court does not consider summary judgment for this claim."); *Polizois v. Vengroff Williams, Inc.*, No. 16-CV-7011, 2018 WL 1443875, at *7 (E.D.N.Y. Mar. 22, 2018) ("[G]iven defendant did not specifically move on those claims (or adequately brief the issues), the Court will not determine whether summary judgment is warranted on those claims.").